Walter E. Miller, Appellee, v. Illinois Central Railroad Company, and Albert Miller, Appellants.
Albert Miller, Appellant, v. Illinois Central Railroad Company, and Walter E. Miller, Appellees.

Gen. No. 9,480.

172

Opinion
filed February 28, 1946.   Released for publication March 26, 1946.

MARK O. ROBERTS, of Springfield and N. E. HUTSON, of Monticello, for appellant; MARK O. ROBERTS, of Springfield, of counsel.

ROBERT P. SHONKWILER, of Monticello, and JOHN W. FREELS, of Chicago, for certain appellee; VERNON W. FOSTER and CHARLES A. HELSELL, both of Chicago, of counsel.

WEILEPP & WILSON, of Decatur, and HAWBAKER & SIEVERS, of Monticello, for certain other appellee.

MR. JUSTICE DADY delivered the opinion of the court.
This is a personal injury and property damage suit growing out of a collision between a locomotive and a tractor-trailer truck while the truck was crossing railroad tracks on a public highway.

The plaintiff, Walter E. Miller, who was riding in but not driving the truck, brought suit against the Illinois Central Railroad Company and Albert Miller. Albert Miller, a brother of the plaintiff, was driving the truck. Albert Miller filed a counterclaim against Walter E. Miller and the railroad company. Both brothers suffered personal injuries and property damage.

By its verdict a jury found the defendant Albert Miller guilty on the original complaint and assessed Walter E. Miller's damages at $3,000. The verdict found the railroad company not guilty on such complaint. The trial court denied Albert Miller's motion for a directed verdict at the conclusion of the plaintiff's evidence and at the conclusion of all of the evidence, denied his motion for judgment notwithstanding the verdict, and denied his motion for a new trial.

On the original complaint the court entered judgment on the verdict in favor of Walter E. Miller and against Albert Miller for $3,000 and costs, and entered judgment in favor of the railroad company and against Walter E. Miller.

On the counterclaim of Albert Miller, the court allowed the motion of the railroad company for a directed verdict at the conclusion of the counterclaimant's evidence, and later denied the counterclaimant's motion for a new trial and entered judgment in favor of the railroad company.

Albert Miller is the only appellant.

The first contention of appellant, Albert Miller, is that the proofs show that at the time of the accident the plaintiff, Walter E. Miller, was a guest in the motor vehicle of the appellant and therefore cannot maintain this action, and the court erred in denying appellant's motion for a judgment notwithstanding the verdict, because the Guest Act, sec. 58a, ch. 95½, Ill. Rev. Stat. 1945 [Jones Ill. Stats. Ann. 85.064(1)] provides:

"No person riding in a motor vehicle as a guest, without payment for such ride, . . . shall have a cause of action for damages against the driver or operator of such motor vehicle or its owner or his employee or agent for injury, death or loss, in case of accident, unless such accident shall have been caused by the wilful and wanton misconduct of the driver or operator of such motor vehicle or its owner or his employee or agent . . . "

and because the complaint does not charge wilful and wanton misconduct on the part of the driver of the truck, but merely charges that the plaintiff engaged the defendant (appellant) to transport for plaintiff certain livestock from Chicago to Cisco, Illinois, that in order to take care of said livestock plaintiff accompanied same in the truck from Chicago towards Cisco, that said contract did not allow or permit plaintiff to direct or control the operation of the truck, that plaintiff engaged with Albert Miller to pay the usual and customary price of such transportation of said livestock and that as a part of such consideration, and in order to care for said livestock, plaintiff was permitted to ride in the truck.

Walter E. Miller and Albert Miller, his brother, lived in the same neighborhood at or near Cisco, Illinois. Walter was aged 62 years. Albert was aged 67 years. Walter was a farmer and from time to time sold in various markets livestock which he had raised or fattened. Albert was engaged in the trucking business and owned and operated several trucks for hire. Albert for several years had hauled most of Walter's livestock to various markets, for which service he was always paid by Walter. Walter testified that as a part of their job, Albert and his drivers had to get the cattle up when the cattle were down in a truck. On some but not all of such trips Walter also rode on the truck which carried the livestock. Walter testified that when he went along on such occasions Albert did

not charge him anything for riding, but he went along principally to see what price the livestock brought, and also to take care of such stock. Albert testified that his ordinary running time between Cisco and Chicago was about six hours.

The accident occurred in open country near White Heath, Illinois, on Tuesday, September 29, 1942, about 5:20 p. m. at a time when Albert was hauling eight cattle and two horses from Chicago to Cisco. The distance between Chicago and the place of the accident was about 145 miles. Walter and Albert were the only ones on the truck. Walter had purchased one of the horses in Chicago on Monday, September 28, 1942, and was having the other horse taken to Cisco for the purpose of trying to sell it for a friend. The weight of the truck and load was about ten tons.

Walter testified that shortly before September 27, 1942, he told Albert he wanted Albert to take a couple of truck loads of cattle to Chicago; that Albert said he would do so, and would charge thirty cents a hundred pounds; that he, Walter, told Albert that he wanted to go along to see the cattle sold, but that he was not coming back the same day, and would stay in Chicago and probably buy a saddle horse, and asked Albert if he could later bring such horse back, and that Albert said he could; that on Sunday night, September 27, 1942, two of Albert's trucks, driven by two of Albert's employees, took Walter's cattle to Chicago where they were sold the next day; that he, Walter rode on one of the trucks and stayed in Chicago until Tuesday; that Albert came up Monday night with a load of cattle belonging to a third party; that the following morning, that is on Tuesday morning, the day of the accident, there was loaded into Albert's truck eight cattle and the two horses; that the cattle belonged to a third party; that he, Walter, helped Albert load the horses into the truck and they put blankets on the horses, and Walter and Albert then, about 10:00 a. m., got into the

truck, and thereafter until the accident Albert was driving the truck toward Cisco; that he did not think anything was said between him and Albert about whether Albert charged for hauling the horses, but that Albert always charged and he, Walter, always expected to pay; that Walter told him he could haul the horses, and he paid Albert for everything except bringing the horses toward Cisco.

Albert testified that a day or two before September 27, 1942, he had arranged with Walter to take the latter's cattle to Chicago; that Walter said he wanted to go there Sunday night; that on Sunday night two of Albert's employees drove the trucks and Walter rode away in one of such trucks; that Walter helped load the cattle into the trucks; that Walter said, "I will go up with these boys and will stay over and come back with you"; that Walter said he expected to buy a horse in Chicago and wanted Albert to bring the horse back to Cisco; that the next day he, Albert, took another truck load of cattle to the yards in Chicago, the cattle belonging to a third party; that on Monday night he and Walter slept in the same room in a hotel, and the next morning had breakfast together and then went to the yards and loaded the truck with the cattle and horses, and then started for Cisco. When asked "What happened with reference to Walter E. Miller arranging to ride" back from Chicago, Albert testified, "Well, he didn't need to make any arrangements, when they wanted to ride they just piled in, that is all there is to it," and that "nothing" was said about Walter riding; that he, Albert, got paid by customers for hauling livestock and "we don't expect any help from anybody else, but if they go along and want to help they sure get a chance to"; that his charge "at that time was fifteen cents a hundred on return stuff. Where we took a load up there for a man and returned stuff for him we returned that at half price."

No Illinois case has been called to our attention in which we consider the facts as being analogous to the facts in the present case. We do not consider as being in point such cases as *Crane v. Railway Express Agency*, 369 Ill. 110, and *Blank v. Illinois Cent. R. Co.*, 182 Ill. 332, which cover the question of the liability of common carriers of passengers.

In *Connett v. Winget*, 374 Ill. 531, 534, the court said: "In determining whether a person is a guest within the meaning of the 'Guest statutes' in the several States, consideration is given to the person or persons advantaged by the carriage; if it confers only a benefit incident to hospitality, companionship or the like, the passenger is a guest, but if the carriage tends to promote mutual interests of both the person carried and the driver, or if the carriage is primarily for the attainment of some objective or purpose of the operator, the passenger is not a guest within the meaning of such enactments. . . . Many instances may be imagined where a person riding in the automobile of another and not paying, is not a guest as defined by the statute. In Webster's New International Dictionary a guest is defined as a 'person to whom the hospitality of the home (etc.) is extended.' As applied to an automobile, the owner carrying another for the purpose of selling something cannot be said to be extending hospitality when he expects or hopes for material benefit from the carriage."

In *Klopfenstein v. Eads*, 143 Wash. 104, 254 Pac. 854, the court said: "It is plain that the deceased was not a trespasser, because he was riding with the knowledge and apparent consent of the driver of the truck. We are also of the opinion that he was not a passenger for hire. There is nothing in the record to show that he paid or expected to pay for his own transportation. It merely shows that he hired the appellants to transfer his trunks from Olympia to Shelton, and that he

got in the car without invitation. . . . Merely hiring appellants to haul his trunks would not make him a passenger for hire. It seems to us that the deceased was a mere 'guest,' riding in the truck at his own invitation but with the consent of the driver, and for his own benefit and convenience.'' (See also *Te Selle v. Terpstra,* 180 Wash. 73, 38 P. (2d) 379.)

In *Chaplowe v. Powsner,* 119 Conn. 188, 175 Atl. 470, the court said: ''While we have held that 'the Legislature, when it used the word ''guest,'' did not intend to include persons who are being transported for the mutual benefit of both the passenger and the operator or owner of the car,' we have also said that in determining as to the existence of such mutual benefit 'not merely the act of transportation must be considered, but also any contract or relationship between the parties to which it was an incident.' In *Leete v. Griswold Post,* 114 Conn. 400, 408, 158 A. 919, 922, we further pointed out that 'the extent and nature of the reciprocal advantages,' which will constitute such mutual benefit as will relieve one of the disabilities of a guest, 'are not unlimited but are confined to certain definite relations, such as master and servant, and to tangible benefits accruing to the transporter—as in saving time for which he as master pays, facilitation of a servant's work, or the like.' These limitations and their practical application have been illustrated by subsequent cases which have come to this court and right of recovery has been sustained only when such definite relations and tangible benefits have been present.''

Applying the foregoing rules of law, it is our opinion and we find that at the time of the accident Walter E. Miller was a guest, without payment for such ride, within the meaning of the Guest Act, and therefore cannot maintain this action against Albert Miller. The carriage of Walter E. Miller was not primarily for the attainment of any objective or purpose

of Albert. There was no charge directly or indirectly for his ride. In our opinion there is no evidence showing or tending to show that Walter's presence was necessary or tangibly helpful to Albert, or that his so riding in any way tended to promote the mutual interests of both parties. Although Walter testified that when he rode on such occasions he did so partly to care for the livestock, this statement was a mere conclusion. All he did in this respect on this trip was to help load the cattle and horses and to blanket the horses on leaving the yards in Chicago, and it does not appear that anything else was done or to be done by him for or with the livestock on the return trip.

The next question presented is whether on the counterclaim of appellant the trial court erred in directing a verdict in favor of the railroad company at the conclusion of counterclaimant's evidence, and in later entering judgment in favor of such company and against Albert Miller on the counterclaim. In passing on such question we can consider only such evidence as was introduced before the verdict was directed.

At the time of the accident Albert Miller was driving the truck southerly on State route 47 which was paved. The railroad tracks crossed the highway at or nearly at right angles. North of the crossing there was a curve in the highway, but from the southerly end of such curve to the crossing, for a distance of from 400 to 600 feet, the highway was straight. At the crossing there were a wigwag signal and bell and the usual railroad crossing signs.

The truck was about 34 feet in length, and about 25 feet of the truck passed in front of the engine before it was struck. The train was going about 15 or 20 miles per hour, and stopped when the locomotive, tender and three freight cars had passed over the crossing. The locomotive was about 15 feet in height. Corn about six feet in height was growing in the field west of the highway and north of the railroad. Weeds

and sumac were growing along the right of way to a height of five or six feet.

Albert Miller testified that the brakes on his truck had recently been repaired and were in good condition; that the cab window was closed on his side but open on Walter's side; that there was a very heavy head wind; that he was familiar with the crossing and had been over it many times, and knew there was a signal device at the crossing; that they were going about 30 miles per hour when an automobile then distant about 200 feet pulled off from a side road and in front of the truck; that such automobile was going about 10 miles an hour so he started to go around such automobile on its left when about 600 feet north of the crossing, and in passing such automobile he traveled about 150 feet; that he was pulling back on to the right side of the highway when he first saw the railroad wigwag signal moving; that there was a glaring sun to his right, but the sun was not bothering him; that he thought such wigwag movement was due to the wind; that he then looked down the track and when about 75 or 80 feet from the crossing saw the smoke from the locomotive and that Walter then hollered; that he did not then make any effort to stop because he knew he could not stop, but he immediately pulled toward the left as quickly as he could, and when about 70 or 80 feet from the crossing he gave the truck all the gas he could and went across the crossing, but the rear of the truck was struck by the locomotive; that as he approached the crossing he heard no whistle and there was no red light flashing at the crossing; that immediately after the accident the wigwag signal was working just a little, but the bell was not ringing and there was no red light on the wigwag signal.

Walter testified that about a half or quarter of a mile before reaching the crossing an automobile pulled onto the highway in front of Albert's truck; that Albert then speeded up to about 30 or 35 miles per hour

and passed such automobile; that as they approached the crossing he, Walter, saw a signal mast and signal device quite a piece back from the crossing, but there was no wigwag working, and when about 200 or 300 feet north of the crossing, and while they were going about 30 or 35 miles per hour, he first saw the smoke of an engine, the smoke being about the same distance from the crossing as was the Miller truck; that the crossing signal had not at that time begun to work; that he, Walter, immediately said, "Albert, there is a train," and Albert automatically released the gas for they slowed up a little; that he, Walter, then unfastened the door and stepped on the running board and fell on the pavement; that before he fell Albert started going faster and said, "I cannot stop"; that he was watching the train and thought the engine bell was ringing when the train went over the crossing, but that he did not hear any bell or whistle until the train was about at the crossing.

Darwin Musick testified that he was driving northerly on route 47 and saw the train approaching the crossing, and saw the accident when about a quarter of a mile south of the crossing; that he paid no attention to whether a whistle was blowing, and did not hear any bell that he knew of; that he then went to the crossing; that the wigwag signal was then moving back and forth but there was no light flashing; that the level of the ground in the field northwest of the crossing was lower than the pavement and sloped toward the north until it was about level with the railroad tracks, 100 or 200 yards north of the highway.

We believe the foregoing is a fair statement of all the material evidence before the court at the time the motion for a directed verdict was allowed.

The specific charges of negligence alleged in the counterclaim were that the railroad company (1) improperly and negligently operated said train; (2) negligently ran said train at a high and dangerous rate

of speed; (3) negligently failed to slacken the speed of said train upon approaching the crossing; (4) negligently failed to erect proper signs and warnings at the crossing; (5) negligently failed to keep its right-of-way clear of brush and weeds, and (6) negligently failed to cause a bell or whistle to be sounded as required by statute.

We do not consider that there is any evidence in the record tending to support the first three charges.

As to the fourth charge, the only complaint is that the wigwag and bell were not properly working. Albert says that when he first saw the wigwag it was moving, but he thought this movement was due to the heavy wind and that the wigwag was working just a little. Albert having seen the wigwag working, it is immaterial whether Walter saw it working or not. Assuming, however, that the wigwag bell was not working and that there was no red light on the wigwag, we do not consider that under the particular circumstances of this case such facts tended to show actionable negligence.

As to the brush and weeds so assumed to be on the highway, we do not believe there is any evidence tending to show that Albert Miller, seated as he was in the truck, could not have looked over the top of such weeds and brush and have seen the locomotive and boxcars if he was in the exercise of reasonable care for his own safety.

As to the charge that the whistle and bell were not properly sounded, it is our opinion that the evidence which it is claimed tends to prove such charge has no probative value. In *Berg v. New York Cent. R. Co.*, 391 Ill. 52, at page 60, the court said, "It is obvious that if a witness, without explanation of his evidence, testifies that he did not hear a bell or whistle, such testimony would have no value. To give it probative force, it must appear that the witness was in such proximity that he could have heard the sound

had it been given, and that his attitude of attention was such that if the bell or whistle had sounded it would have attracted his attention." According to the testimony of Albert and Walter, the truck was traveling about 30 miles per hour against a heavy head wind, the cab window on Albert's side was closed, Albert was intent on passing another car, and it does not appear that their attitude of attention was such that if the bell or whistle had sounded it would have attracted their attention. Musick paid no attention to whether a bell was ringing or not. In *Moudy v. New York, C. & St. L. R. Co.*, 385 Ill. 446, 452, the court said: "One who has an unobstructed view of the approaching train is not justified in closing his eyes in crossing a railroad track in reliance upon the presumption that a bell would be rung or a whistle sounded, and offer the presumption as an excuse for not exercising care. . . . Likewise it is clear that if the view of the crossing is obscured, and the location of the crossing is known to the traveler, it is his duty to approach the crossing with the amount of care commensurate with the situation as it exists. The claim that care and caution by any person has been exercised cannot be sustained, when the known facts disclose that ordinary care would have avoided the accident. . . . If the plaintiff is to be believed in all that he says he was simply taking the chance there would be no train, and, without being able to see a train, was relying blindly upon hearing its sound, when he knew it would be impossible for him to stop his car after he had reached the speed described by him."

It is our opinion that the trial court properly directed the verdict against Albert Miller and in favor of the railroad company because we find as a matter of law that no actionable negligence of the railroad company was shown, and because we find that the proofs show that Albert Miller was guilty of contributory negligence as a matter of law.

The judgment which was rendered in favor of the railroad company and against Albert Miller on the counterclaim is affirmed.

The judgment which was rendered in favor of Walter E. Miller and against Albert Miller is reversed.

One half of the costs in this court are ordered taxed against Albert Miller and the other half of such costs are ordered taxed against Walter E. Miller.

*Affirmed in part, and reversed in part.*